UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| LEONARD HROMEK, KIMBERLY HROMEK, and MICHAELLA PACK, Administrators of the Estate of NICHOLAS P. HROMEK, | : <br> : <br> : <br> : <br> : |
| Plaintiffs, | : |
| | :     JURY TRIAL DEMANDED |
| v. | : |
| | :     NO.: _____ |
| BOROUGH OF EXETER, and CHIEF SCHLAGEL, | : <br> :     (JUDGE _____) |
| | : |
| Defendants. | : |

## COMPLAINT

Plaintiffs, Leonard Hromek, Kimberly Hromek, and Michaella Pack, the Administrators of the Estate of Nicholas P. Hromek, by and through their attorneys, Barry H. Dyller, Caelie M. Sweigart, and Dyller & Solomon, LLC, bring this action related to the deprivation of Nicholas P. Hromek's protected rights and in support thereof, allege as follows:

## JURISDICTION AND VENUE

1.  This action arises out of violations of the United States Constitution brought pursuant to 42 U.S.C. § 1983, the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq.*, and the Rehabilitation Act, 29 U.S.C. § 794, *et seq.*

2.  This Court has jurisdiction over this action pursuant to 28 U.S.C. §§

1

1331, 1343, and 1367, and 42 U.S.C. §§ 12133 and 794a(a)(2) (incorporating 42 U.S.C. § 2000e-5).

3. Venue is proper in this judicial district under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claim occurred in this judicial district.

## THE PARTIES

4. Plaintiff Leonard Hromek is an adult individual domiciled in Luzerne County, Pennsylvania.

5. Plaintiff Kimberly Hromek is an adult individual domiciled in Luzerne County, Pennsylvania.

6. Plaintiff Michaella Pack is an adult individual domiciled in Luzerne County, Pennsylvania.

7. Plaintiffs, Leonard Hromek, Kimberly Hromek, and Michaella Pack, (collectively, "Plaintiffs") are the Administrators of the Estate of Nicholas Hromek, who have the authority to bring this claim on behalf of the Estate.

8. At the time of his death, the Decedent, Nicholas P. Hromek, domiciled in Luzerne County, Pennsylvania, was a 24 year-old registered nurse working in the intensive care unit of Geisinger Wyoming Valley Medical Center, Plains Township, Pennsylvania.

9. Defendant Joseph Schlagel ("Chief Schlagel") was at all relevant times

employed by the Borough of Exeter as police chief.

10. Defendant Borough of Exeter (the "Borough") is a municipality in Pennsylvania that, at all relevant times, operated its own police department (the "Exeter Borough Police Department").

11. At all relevant times, Chief Schlagel was the highest policymaker for the Exeter Borough Police Department.

## FACTUAL BACKGROUND

The early morning of August 28, 2021

12. The night of August 27, 2021, the Decedent, Nicholas P. Hromek, ("Mr. Hromek") was attending a birthday party with his girlfriend, Brianna Scutt, ("Ms. Scutt").

13. At approximately 1:30 a.m. on August 28, 2021, Ms. Scutt left the party with a friend and her husband, and returned to their home in the Laurel Lakes section of Mountain Top, Luzerne County, Pennsylvania.

14. Mr. Hromek had another friend pick him up at the party, and drop him at his home in Exeter, Luzerne County, Pennsylvania.

15. At the time, Mr. Hromek was renting a single-family residence located at 238 Susquehanna Avenue, Exeter, Luzerne County, Pennsylvania 18643 (the "Property").

16. Mr. Hromek lived alone at the Property.

3

17. At about 2:00 a.m., Mr. Hromek started to send Ms. Scutt text messages.

18. Just after 2:30 a.m., after returning home to the Property, Mr. Hromek spoke to Ms. Scutt through a video call.

19. During the majority of the call, Mr. Hromek had the camera on his phone facing the ceiling of his apartment.

20. At one point during their conversation, Ms. Scutt was able to see Mr. Hromek's face when he angled the camera in front of himself.

21. In that moment, Ms. Scutt saw that Mr. Hromek had a black rope around his neck.

22. When Ms. Scutt asked Mr. Hromek what was happening, he did not answer and hung up the phone.

23. Ms. Scutt attempted to reach Mr. Hromek again by phone and was unsuccessful.

The Welfare Check

24. At approximately 2:39 a.m., in fear for Mr. Hromek's life and realizing that she was about 20 miles away from the Property, Ms. Scutt called 911 because she believed that police would get to the Property faster than she could.

25. Ms. Scutt explained that Mr. Hromek called her from the Property via video call with a rope around his neck and that he was suicidal.

26. Ms. Scutt stated that Mr. Hromek told her that he previously had a suicide plan in January 2021.

27. During the 911 call, Ms. Scutt also indicated that Mr. Hromek lived alone and had no weapons.

28. Believing that police were being sent to check on Mr. Hromek, Ms. Scutt did not try to otherwise reach the Property and waited to hear from police.

29. Chief Schlagel was dispatched in response to Ms. Scutt's 911 call.

30. The Greater Pittston Regional Ambulance – Medic 29 ("Medic 29") was also dispatched to the Property; however, Chief Schlagel ordered Medic 29 not to respond to the Property and to, instead, stage in quarters.

31. Upon information and belief, it is the general policy of Medic 29 to break into a house upon a call for a welfare check where the individual is not responding to requests for entry.

32. As Chief of the Exeter Borough Police Department, Chief Schlagel was in command of the welfare check and the response to the Property.

33. Chief Schlagel was assisted at the Property by Patrolman Joshua Seguine from the West Wyoming Borough Police Department ("Officer Seguine").

34. Upon arrival, Chief Schlagel and Officer Seguine knocked on the front door of the Property to no response.

35. Chief Schlagel and Officer Seguine then knocked on the backdoor of the Property to no response.

36. Both the front and back doors of the Property were locked.

37. According to police reports, the windows at the Property were also locked; however, in the same area where Mr. Hromek's body was eventually found, there was an open window with an air conditioning unit in it that was not secured at the sides and was accessible from the outside of the Property.

38. Chief Schlagel called Ms. Scutt from the Property and said that it appeared no one was home.

39. Ms. Scutt explained that she spoke to Mr. Hromek and that he was home.

40. In response, Chief Schlagel asked who had a key to enter the Property because, according to Chief Schlagel, he could not enter the Property without a key.

41. Ms. Scutt indicated that she was the only person with a key to the Property, but that she was in Mountain Top and would need at least 30 minutes to travel there.

42. Ms. Scutt again explained that Mr. Hromek had a rope around his neck and urged Chief Schlagel to break into the Property.

43. Chief Schlagel responded that, if Mr. Hromek was "bluffing" about

6

committing suicide and they broke into the Property, then a lawsuit would result.[1]

44.     Chief Schlagel chose instead to wait the 30 minutes it would take for Ms. Scutt to travel from Mountain Top to Exeter before entering the Property to check on Mr. Hromek and prevent his suicide.

45.     Once it was clear that Chief Schlagel had no intention of letting anyone enter the Property without the key, Ms. Scutt raced the 20 miles from Mountain Top to Exeter.

46.     During Ms. Scutt's travel time, Chief Schlagel and Officer Seguine remained outside the Property, doing nothing to prevent Mr. Hromek's suicide or otherwise save his life.

47.     Upon information and belief, Officer Seguine wanted to break into the Property to check on the safety of Mr. Hromek, but he was instructed not to by Chief Schlagel.

48.     Having relied on Chief Schlagel's welfare check instead of immediately traveling to the Property herself, Ms. Scutt did not arrive at the Property until approximately 3:30 a.m., 50 minutes after her call to 911.

49.     Upon arrival, Ms. Scutt gave the key to the Property to Chief Schlagel.

50.     Chief Schlagel and Officer Seguine then entered the Property through

---

[1] Chief Schlagel's excuse to Ms. Scutt was not grounded in law, as the exigency of the circumstances would have allowed him to enter the Property without a warrant.

7

the front door.

51. After walking through the first two rooms in the Property, Chief Schlagel and Officer Seguine located Mr. Hromek's body sitting on the staircase with a rope around his neck that was tied to the banister at the top of the steps.

52. Chief Schlagel and Officer Seguine cut down Mr. Hromek's body and laid him flat on the floor to check for a pulse.

53. Mr. Hromek's body was still warm to the touch, but no pulse was found.

54. At approximately 3:37 a.m., Medic 29 was finally called to the scene on an emergent basis at the request of Chief Schlagel.

55. After exiting the Property, Chief Schlagel told Ms. Scutt that Mr. Hromek had hung himself.

56. Upset and in disbelief, Ms. Scutt and her friend, who are both nurses, asked to enter the Property to provide medical care to Mr. Hromek.

57. Chief Schlagel told them that Mr. Hromek was already turning purple and there was nothing they could do.

58. Both Ms. Scutt and her friend were denied access to the Property.

59. Medic 29 arrived at the Property without incident; however, it was too late, as EMTs found Mr. Hromek to be non-responsive.

60. The Luzerne County Coroner's Office later responded to the scene and

pronounced Mr. Hromek dead at 4:20 a.m.

61. The Luzerne County Coroner listed Mr. Hromek's immediate cause of death as "asphyxiation due to hanging."

Mr. Hromek's Death

62. Mr. Hromek suffered psychological injuries and death as a result of Chief Schlagel failing to enter the Property and actively preventing any other emergency responders from entering the Property to secure Mr. Hromek's physical safety.

63. As a result of Chief Schlagel's interference in the emergency care to be provided following Ms. Scutt's 911 call, approximately 50 minutes passed before any emergency responders were permitted to enter the home.

64. During the time between Chief Schlagel's arrival at the Property and the eventual arrival of Medic 29, Mr. Hromek succeeded in taking his own life.

COUNT ONE
State Created Danger
Plaintiffs v. Chief Schlagel
(42 U.S.C. § 1983)

65. Plaintiffs repeat and reallege each and every allegation contained above as if fully repeated herein.

66. Chief Schlagel assumed a duty to keep Mr. Hromek safe when he affirmatively placed Mr. Hromek in a position of danger that Mr. Hromek would not have otherwise faced by preventing requested emergency care or any other means of

9

aid from reaching him.

67. The harm suffered by Mr. Hromek was a foreseeable and fairly direct consequence of Chief Schlagel affirmatively preventing Medic 29 from responding to the Property, stopping Officer Seguine from entering the Property, and otherwise thwarting any other means of aid available to Mr. Hromek.

68. Chief Schlagel's conduct in this regard was willful, reckless, and conscious shocking as he actively prevented emergency care from reaching Mr. Hromek.

69. Mr. Hromek was a foreseeable victim of Chief Schlagel's actions, as Chief Schlagel was dispatched to check on the welfare of a suicidal Mr. Hromek, but chose to wait approximately 30 minutes for a key to the Property before entering, while also actively preventing other individulas, emergency responders, and/or Officer Sequine from entering the home and rendering aid.

70. Chief Schlagel affirmatively exercised his authority to create a danger and/or make Mr. Hromek more vulnerable to danger than had Chief Schlagel not acted at all.

71. By ignoring Mr. Hromek's suicidal mental state and actively preventing other individuals, emergency responders, and/or Officer Seguine from entering the Property to render aid, Chief Schlagel made Mr. Hromek more vulnerable to harm.

72. As a result of Chief Schlagel's violations of Mr. Hromek's constitutional rights, Mr. Hromek suffered substantial damages and death.

<u>COUNT TWO</u>
Plaintiffs v. Borough of Exeter
(42 U.S.C. § 1983)

73. Plaintiffs repeat and reallege each and every allegation contained above as if fully repeated herein.

74. Based upon information and belief, and consistent with Chief Schlagel's cavalier treatment of Mr. Hromek's suicidal mental state, the Borough had policies, practices and/or customs related to the following:

    a. Avoiding breaking into properties where there is no suspicion of criminal activity even where a person's life is in danger;

    b. The failure to seek and/or accept authority to enter a property where a person's life may be in danger;

    c. Placing concerns about damage to property and/or potential civil actions over the lives of suicidal and/or mentally unstable individuals; and,

    d. The failure to train its police officers on responding to calls related to the welfare of suicidal and/or mentally unstable callers.

75. Further, as the highest policymaker for the Exeter Borough Police Department, Chief Schlagel's actions constituted the Borough's policy for policing.

76. Chief Schlagel was responsible for ensuring that each member of the Exeter Borough Police Department was fully trained in all policing matters, including,

but not limited to, search and seizure law, welfare checks involving suicidal individuals, and obligations to disabled persons as defined by the Americans with Disabilities Act.

77. The Borough and Chief Schlagel did not ensure that each member of the Exeter Borough Police Department, including Chief Schlagel, was fully trained in all policing matters, including, but not limited to, search and seizure law, welfare checks involving suicidal individuals, and obligations to disabled persons as defined by the Americans with Disabilities Act.

78. No other person acting on behalf of the Borough ensured or had the responsibility to ensure that each member of the Exeter Borough Police Department, including Chief Schlagel, was fully trained in all policing matters, including, but not limited to, search and seizure law, welfare checks involving suicidal individuals, and obligations to disabled persons as defined by the Americans with Disabilities Act.

79. As a result of the Borough's violations of Mr. Hromek's constitutional rights, Mr. Hromek suffered substantial damages and death.

## COUNT THREE
Plaintiffs v. Borough of Exeter
(Americans with Disabilities Act)

80. Plaintiffs repeat and reallege each and every allegation contained above as if fully repeated herein.

81. Mr. Hromek was disabled within the meaning of the Americans with Disabilities Act as he was mentally unstable and suicidal.

12

82.     Prior to Mr. Hromek's suicide, Defendants were aware of Mr. Hromek's mental state given Ms. Scutt's call to 911 which indicated that Mr. Hromek was threatening suicide, had a rope around his neck, and had been suicidal in the past.

83.     Mr. Hromek's mental instability was specifically known by Chief Schlagel prior to his arrival at the Property as he was sent to check on the welfare of a suicidal Mr. Hromek and spoke directly to Ms. Scutt regarding Mr. Hromek's threats of suicide.

84.     Rather than check on the welfare of the suicidal individual, Chief Schlagel made an initial attempt at communicating with Mr. Hromek, but ceased all efforts upon finding the door to the Property locked.

85.     Instead, Chief Schlagel prioritized concerns about damage to the Property and/or potential civil actions over the safety and well-being of Mr. Hromek, as he refused to enter the Property without a key, ordered Medic 29 to stage in quarters, and prevented Officer Seguine from breaking into the Property.

86.     The Borough's knowledge of Mr. Hromek's mental health condition predated the deprivation of his constitutional and statutory rights.

87.     Reasonable accommodations for individuals with mental disabilities and mental health conditions who are threatening suicide, include, but are not limited to, timely establishing communication, checking on the individual's wellbeing, and taking necessary steps to prevent self-harm.

88.     Under the circumstances, a reasonable accommodation for a suicidal

individual with a rope around his neck, would be to enter the property on an emergent basis, including by breaking in, to attempt to prevent the disabled individual from taking his own life, or to otherwise render aid.

89. Further, given the circumstances, a reasonable accommodation for a suicidal individual with a rope around his neck would be to accept the authority of a key holder to forcibly enter the Property to save the disabled individual's life.

90. Instead of making these accommodations, Chief Schlagel failed to enter the home to save Mr. Hromek.

91. Chief Schlagel also failed to timely establish communication, check Mr. Hromek's wellbeing, and/or render any aid or attempt to prevent self-harm, while also actively preventing others from entering the Property, establishing communication, checking Mr. Hromek's wellbeing, and/or attempting to prevent self-harm.

92. Despite knowing of the obvious risk that its officers may discriminate on the basis of disability and/or fail to make reasonable accommodations when responding to calls involving mental health conditions, the Borough chose not to provide its officers with specialized training for interacting with individuals with mental health conditions and/or those who are known to be suicidal.

93. Based upon information and belief, Chief Schlagel had no specialized training with respect to individuals with mental health conditions and/or involving suicidal individuals, including when it is acceptable and/or required to enter a building under the exigent circumstances of a suicidal individual with a rope around his neck.

94. The Borough therefore acted with deliberate indifference by failing to properly train its officers to enter a property under the exigency presented by a suicidal person inside, timely establish communication with a suicidal individual, check the individual's wellbeing, and/or take measures to secure the individual's physical well-being.

95. The Borough further acted with deliberate indifference by failing to modify policy and practices to reasonably accommodate individuals with mental health issues and mental instability pursuant to the ADA.

96. Further, to the extent that the Borough had policies and provided officers training regarding situations involving suicidal individuals, Chief Schlagel failed to follow those policies and trainings.

97. Specifically, Chief Schlagel failed to enter the Property, timely establish communication with, check the wellbeing of, and/or take steps to secure the physical safety of Mr. Hromek, while also preventing others from doing so.

98. Moreover, Chief Schlagel completely ignored the urgency of the situation given Mr. Hromek's mental state and apparent possession of an instrument to commit suicide.

99. Under the ADA, the Borough is vicariously liable for the acts of its employees.

100. The Borough therefore acted with deliberate indifference to Mr. Hromek by and through the actions of Chief Schlagel.

101. As a result of the Borough's violation of the Americans with Disabilities Act, Mr. Hromek suffered substantial damages and death.

## COUNT FOUR
Plaintiffs v. Borough of Exeter
(Rehabilitation Act)

102. Plaintiffs repeat and reallege each and every allegation made above as if fully repeated herein.

103. The Borough is an entity that receives federal funding.

104. The Borough's actions and inactions as described above violated the Rehabilitation Act.

105. As a result of the Borough's violations of the Rehabilitation Act, Mr. Hromek suffered substantial damages and death.

## COUNT FIVE
Plaintiffs v. Chief Schlagel
(Wrongful Death)

106. Plaintiffs repeat and reallege each and every allegation made above as if fully repeated herein.

107. Plaintiffs bring this Wrongful Death Action, pursuant to 42 Pa. C.S. § 8301, on behalf of the following individual, who is entitled to recover for Nicholas Hromek's wrongful death:

    a. N.H., a minor, his son.

108. By reason of the death of the Decedent, Nicholas Hromek, the aforementioned wrongful death beneficiary has incurred and makes claims for all

hospital, medical, burial, funeral and administration expenses, as well as claims for the contributions and services the Decedent, Nicholas Hromek, would have made to the aforementioned wrongful death beneficiary during his lifetime, including grief damages as allowed under Pennsylvania law.

109. The Decedent, Nicholas Hromek, did not bring an action for personal injuries during his lifetime, and no civil action for his death, other than the current action, has been commenced against Defendants.

COUNT SIX
Plaintiffs v. Chief Schlagel
(Survival)

110. Plaintiffs repeat and reallege each and every allegation made above as if fully repeated herein.

111. Plaintiffs also bring this action on behalf of the Estate of Nicholas Hromek, Deceased, pursuant to 42 Pa. C.S. § 8302.

112. Plaintiffs claim on behalf of the Estate, damages suffered by the Estate by reason of the death of the Decedent, Nicholas Hromek, including the monetary value of the earnings power of the Decedent during his remaining life expectancy, less the cost of his maintenance, as well as the physical and mental pain and suffering endured by the Decedent, Nicholas Hromek, in the time that he suffered following the constitutional violation and prior to his death on August 28, 2021.

WHEREFORE, Plaintiffs demand judgment as follows:

A. As to Defendant Borough of Exeter, an amount to be determined at trial plus interest;

B. As to individual Defendant Chief Schlagel, an amount to be determined at trial, including punitive damages, plus interest;

C. For plaintiffs' attorneys' fees, pursuant to 42 U.S.C. § 1988, 12205 and 794a;

D. For the costs and disbursements incurred in this action; and,

E. For such other and further relief as the Court deems just and proper.

DYLLER & SOLOMON, LLC

/s/ Barry H. Dyller
/s/ Caelie M. Sweigart
Attorneys for Plaintiff
88 North Franklin Street
Wilkes-Barre, PA  18701
(570) 829-4860

## JURY DEMAND

Plaintiffs demand a trial by jury.

Dated: